UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

IN RE:                          )
                               )
PHOTO STENCIL, LLC           )      Case No. 16-16897-MER
EIN: 26-0334354              )      Chapter 11
                               )
     Debtor.                  )

**MOTION TO 1) ASSUME NONRESIDENTIAL REAL PROPERTY LEASE AGREEMENT WITH PEOPLES NATIONAL BANKING ASSOCIATION AND 2) APPROVE STIPULATION ON ASSUMPTION AND MODIFICATION OF COMMERCIAL LEASE**

The Debtor, Photo Stencil, LLC ("Debtor"), by and through its attorneys, Kutner Brinen, P.C., moves this Court for entry of an Order pursuant to 11 U.S.C. § 365(a) and Bankruptcy Rules 6006 and 9014 authorizing the Debtor to assume and modify its nonresidential real property lease Agreement with Peoples National Banking Association ("Landlord") and approving the Stipulation on Assumption and Modification of Commercial Lease and as grounds therefor, states as follows:

1.      The Debtor filed its voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code on July 12, 2016. The Debtor remains a Debtor-In-Possession.

2.      The Debtor is engaged in business as a designer and manufacturer of high-performance stencils, squeegee blades, and tooling for the surface mount assembly, solar, and semiconductor industries. Among other things, the Debtor designs and manufactures high end stencils for the electrical component industry and is the only such company with such capability in North America. The Debtor operates out of its facility located at 16080 Table Mountain Parkway, Suite 100, Golden, Colorado 80403. Additional information on the Debtor is located at the Debtor's website, www.photostencil.com.

3.      Pre-petition the Debtor entered into a Commercial Lease (together with all attachments and thereto, the "Lease") dated August 25, 2015 with Landlord for the premises located at 13725 Struthers Road, Suite 202, Colorado Springs, Colorado 80921, comprised of approximately 4,135 square feet of office and storage space (the "Property").

4.      In connection with the Lease, the Debtor provided Landlord with a deposit in the amount of $6,000.

5.      Pursuant to the Lease, the monthly base rent for the Property is $6,516.88. The initial

term of the Lease was from September 15, 2015 through September 30, 2018, with the option to renew the Lease for two additional three-year terms.  A copy of the Lease is attached hereto as Exhibit A

6.      Post-Petition the Debtor entered into a Stipulation on Assumption and Modification of Commercial Lease ("Stipulation") which is attached hereto as Exhibit B.  Pursuant to the Stipulation the Lease will be modified such that the monthly rent will be reduced to $2,500, and the Debtor will lease the Property on a month-to-month basis, terminable by either the Debtor or Landlord upon thirty (30) days written notice.  The Debtor will also vacate two contiguous offices to be re-leased at the Landlord's discretion.

7.      Bankruptcy Code § 365(d)(4)(A) provides that the Debtor shall surrender any non-residential real property unless it assumes the governing lease the earlier of the date that is 120 days after the Petition Date or the date on which a plan is confirmed.  The 120th day is November 9, 2016.

8.      The Debtor, in exercising its business judgment, has concluded that the Lease, as modified by the Stipulation, provides a benefit to the Debtor, its estate, and its reorganization effort, and therefore seeks to assume the modified Lease pursuant to section 365(a) of the Bankruptcy Code.  The terms of the Lease and the Stipulation are fair, and will allow the Debtor to reduce the monthly rent for the Property and maintain its operations in Colorado Springs until a new location can be found.

9.      Assumption or rejection of executory contracts or unexpired leases by a debtor is subject to court review under the business judgment standard.  See *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *In re Mile High Medal Systems, Inc.*, 899 F.2d 887, 896 (10th Cir. 1990); *In re Grayhall Resources, Inc.*, 63 B.R. 382, 384 (Bankr. D. Colo. 1986).

10.     Pursuant to the business judgment test, the debtor's decision to assume or reject an executory contract or an unexpired lease should be approved when the debtor decides, in good faith, that assumption or rejection is beneficial to the estate.  *In re Chipwich, Inc.*, 54 B.R. 427, 430-431 (Bankr. S.D.N.Y. 1985) ("it is enough, if, as a matter of business judgment, rejection of the burdensome contract may benefit the estate").  Under Section 365(a), "the debtor's business judgment should not be interfered with, absent a showing of bad faith or abuse of business discretion." *Chipwich, Inc.*, 54 B.R. 430-31.  As stated by one court, "Court approval under Section 365(a), if required, except in extraordinary situations, should be granted as a matter of course." *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981).

11.     Assumption of the Lease, as modified by the Stipulation, is in the best interest of the Debtor, its estate, and its creditors.  The Lease provides a benefit to the estate because it will allow the Debtor to reduce its monthly rent and continue to operate in the Property while locating a new office space in Colorado Springs at a more sustainable rate.  If the Debtor does not assumed the modified Lease, the Debtor will be required to pay a substantially higher monthly rent for the Property, or will have to reject the Lease and vacate the Property prior to finding a new location in Colorado Springs.  Vacating the Property will result in a significant disruption to the Debtor's operations.

12.     The Debtor further seeks approval of the Stipulation.  Approval of the Stipulation is in the best interest of the Debtor, its estate, and its creditors, as it will significantly reduce amount of rent the Debtor is required to pay each month, and will allow the Debtor to maintain its operations in the Property.  The Stipulation will also allow the Landlord to re-lease two office spaces that are currently unused by the Debtor.

WHEREFORE, the Debtor prays that the Court enter an Order authorizing the Debtor to assume the Lease as modified by the Stipulation, approving the Stipulation, and for such further and additional relief as to the Court may deem proper.

Dated: September 23, 2016                     Respectfully submitted,

By: _/s/ Keri L. Riley_
    Lee M. Kutner, #10966
    Keri L. Riley, #47605
    **KUTNER BRINEN, P.C.**
    1660 Lincoln St. Suite 1850
    Denver, CO  80264
    Telephone:  (303) 832-2400
    Telecopy: (303) 832-1510
    E-Mail: lmk@kutnerlaw.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 23, 2016, I served by prepaid first class mail a copy of the foregoing **MOTION TO (1) ASSUME NONRESIDENTIAL REAL PROPERTY LEASE AGREEMENT WITH PEOPLES NATIONAL BANKING ASSOCIATION AND (2) APPROVE STIPULATION ON ASSUMPTION AND MODIFICATION OF COMMERCIAL LEASE AND NOTICE OF MOTION TO (1) ASSUME NONRESIDENTIAL REAL PROPERTY LEASE AGREEMENT WITH PEOPLES NATIONAL BANKING ASSOCIATION AND (2) APPROVE STIPULATION ON ASSUMPTION AND MODIFICATION OF COMMERCIAL LEASE** on all parties against whom relief is sought and those otherwise entitled to service pursuant to the FED. R. BANKR. P. and these L.B.R. at the following addresses:

People's Bank
5175 North Academy Blvd.
ATTN: Brendan Zahl
Colorado Springs, CO 80918

People's Bank
Judy Cleveland
Registered Agent
5175 North Academy Blvd.
Colorado Springs, CO 80918

Daniel J. Morse, Esq.
United States Trustee
308 West 21st Street
Room 203
Cheyenne, WY 82001

David T. Brennan, Esq.
Otten, Johnson, Robinson,
 Neff & Ragonetti, P.C.
950 Seventeenth Street
Suite 1600
Denver, CO 80202

Brian P. Gaffney, Esq.
Snell & Wilmer, LLP
1200 Seventeenth Street
Suite 1900
Denver, CO 80202

Caroline C. Fuller, Esq.
Fairfield and Woods, P.C.
1801 California Street
Suite 2600
Denver, CO 80202

Patrick H. Pugh, Esq.
Ballard Spahr, LLP
1225 17th Street
Suite 2300
Denver, CO 80202-5596

Steven W. Kelly, Esq.
Silver & DeBoskey, P.C.
1801 York Street
Denver, CO 80206

Peter W. Ito, Esq.
Ito Law Group, LLC
1550 Larimer Street
Suite 667
Denver, CO 80202

Mark F. Bell, Esq.
Foster Graham Milstein & Calisher, LLP
360 South Garfield Street
6th Floor
Denver, CO 80209

Joanne M. Schreiner
Dinsmore & Shohl, LLP
255 East Fifth Street
Suite 1900
Cincinnati, OH 45202

Paul Arrow, Esq.
Buchalternemer, P.C.
1000 Wilshire Blvd.
Suite 1500
Los Angeles, CA 90017-1730

Douglas C. Pearce II, Esq.
Connolly, Lofstedt, Cadette & Pearce,
P.C.
950 Spruce Street, Suite 1C
Louisville, CO 80027

David O. Hansen, Esq.
Kumpf Charsley & Hansen, LLC
9565 South Kingston Court
Suite 100
Englewood, CO 80112

Vicky Martina

## COMMERCIAL LEASE

THIS LEASE is made this $\underline{15}$ day of August, 2015 between Peoples National Bank, a national banking association, having an address at 5175 North Academy Boulevard, Colorado Springs, CO 80918 ("Landlord") and Photo Stencil, LLC, a Delaware limited liability company, having an address of 13725 Struthers Road, Suite 202, Colorado Springs, CO 80921 ("Tenant") for space in the building known as or located at 13725 Struthers Road, Suite 202, Colorado Springs, CO 80921 (such building, together with the land upon which it is situated and appurtenant parking facilities, being herein referred to as the ("Building"). The following schedule (the "Schedule") sets forth certain basic terms of this Lease:

### Schedule:

1. Leased Premises: 13725 Struthers Rd., Ste. 202, Colorado Springs, CO 80921 (the "Building"). Consisting of 4,135 sq. ft. (see space plan attached as Exhibit "A"). Tenant shall also have access and full use (for storage purposes) of the storage rooms downstairs in Suite 101. Should the downstairs suite ever become occupied, Landlord shall install a door to secure such storage space and allow reasonable access to that space. While the downstairs space is vacant, Tenant shall have the right to use the large breakroom up to 3 times quarterly for training purposes. Tenant will also get to install and secure their computer server equipment in the appropriate location downstairs. This Lease does not convey use of additional office space or furniture in lower level of building. Any use of such may be negotiated through amendment of this Lease or other lease.

2. Annual Rent: Base Rent of $78,202.56 in year 1, $79,402.56 in year 2 and $80,602.56 in year 3, with the first 2 months of the Lease abated.

3. Commencement Date: The later of (a) September 15, 2015 or (b) when the space is substantially ready for occupancy, but in any event no later than October 1, 2015.

4. Expiration Date: September 30th, 2018, unless extended as set forth in Paragraph 25 of the Lease.

1. DEMISE AND TERM. Landlord leases to Tenant and Tenant leases from Landlord the premises (the "Premises") described in Item 1 of the above Schedule and identified in Exhibit "A," at the address specifically identified on Exhibit "B," subject to the covenants and conditions set forth in this Lease, for a term (the "Term") commencing on the date (the "Commencement Date") and expiring on the date (the "Expiration Date") described in Items 3 and 4 of the Schedule, unless terminated earlier or extended as otherwise provided in this Lease. Tenant shall have the renewal options as set forth in Paragraph 25.

1

**EXHIBIT A**

2.    RENT:

A.    <u>Definitions.</u>    For purposes of this Lease, the following terms shall have the following meanings:

(i)    "Rent" shall mean Base Rent and any other sums or charges due by Tenant hereunder.

(ii)    "Utilities" shall mean all public utilities, including, but not limited to, electricity, water, and natural gas which serve the Premises or the Building.

B.    <u>Components of Rent.</u>    Tenant agrees to pay the following amounts to Landlord at the office of the Building or such other places as Landlord designates:

(i)    Base rent ("Base Rent") to be paid in monthly installments in the amount set forth in Item 2 of the Schedule in advance on or before the fifth day of each month of the Term, except that Tenant shall pay the first month's base Rent ($6,516.88) upon execution of this Lease; and

(ii)    If Tenant adds any operation that consumes energy beyond a normal business use, Landlord reserves the right to survey such energy consumption and bill Tenant for charges that exceed $516.88 per month for their portion of the Utilities.

C.    <u>Payment of Rent.</u>  The following provisions shall govern the payment of Rent: (i) if this Lease commences or ends on a day other than the first day or last day of a calendar year, respectively, the Rent for the year in which this Lease so begins or ends shall be prorated and the monthly installments shall be adjusted accordingly; (ii) all rent shall be paid to Landlord without offset or deduction, and the covenant to pay Rent shall be independent of every other covenant in this Lease; (iii) any sum due from Tenant to Landlord which is not paid when due shall bear interest from the Penalty Date until the date paid at the annual rate of 18% per annum, but in no event higher than the maximum rate permitted by law (the "Default Rate"); and, in addition, Tenant shall pay Landlord a late charge for any Rent payment which is paid more than ten (10) days after it is due date ("Penalty Date") equal to 5% of such payment; (iv) each amount owed to Landlord under this Lease for which the date of payment is not expressly fixed shall be due on the same date as the Rent listed on the statement showing such amount is due.

3.    USE.  Tenant agrees that it shall occupy and use the Premises only for professional offices or general lawful office use and shall not use the Premises for any financial services operation or any retail or commercial banking operation (and for no

2

other purposes.)  Tenant's total occupancy of the Premises will be within the requirements of then current zoning codes and regulation.  Tenant shall comply with all material federal, state and municipal laws, ordinances and regulations and all covenants, conditions and restrictions of record applicable to Tenant's use or occupancy of the Premises.  Without limiting the foregoing, Tenant shall not cause, nor permit, any hazardous or toxic substances to be brought upon, produced, stored, discharged of, or disposed of in, on or about the Premises without prior written consent of Landlord and then only in compliance with all applicable environmental laws.  Prior to changing its usage of the Premises, Tennant shall secure Landlord's written approval, which approval shall not be unreasonable withheld or delayed.

4.      CONDITION OF PREMISES.  Landlord, prior to Tenant's taking possession of the Leased Premises and of Lease Commencement, shall perform, at its own cost, all the necessary work to secure and demise the Leased Premises, according to a mutually agreed-upon floor plan as shown in Exhibit "A."  Tenant's taking possession of the Leased Premises shall be conclusive evidence that the Premises were in good order and satisfactory condition when Tenant took possession.  Tenant shall be granted the use of all the furniture currently in place in the Leased Premises.  Such usage is granted to Tenant by Landlord strictly on an as-is basis, with no guarantees, expressed or implied, of any aspect of said furniture.

5.      BUILDING SERVICES.

        A.      Basic Services.  Services shall be provided by the parties as follows: (i) Landlord shall provide electricity, heating and air conditioning to provide temperature and working conditions required in the Leased Premises; (ii) Landlord shall provide water for drinking, and, subject to Landlords approval, water at Tenant's expense for any private restrooms and office kitchen requested by Tenant; (iii) Landlord shall provide men's and women's restrooms at locations designated by Landlord and in common with other tenants of the Building; (iv) Landlord shall provide daily janitor service in the common areas of the Building (weekends and holidays excepted), including periodic outside window washing of the perimeter windows in the Premises, provided however, Tenant shall provide daily janitor services in the Leased Premises; (v) Landlord shall provide lawn care and landscaping as required to maintain the lawn and landscaping commensurate with the surrounding property; and (vi) Landlord shall provide snow and ice removal as reasonably required in order to allow for safe and convenient usage of the Premises.  As used herein; "holiday" shall include the following: New Years Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas.

        B.      Telephones.  Tenant shall arrange for telephone service directly with one or more of the public telephone companies servicing the Building and shall be solely responsible for paying for such telephone service.  If Landlord acquires ownership of the telephone cables in the Building at any time, Landlord shall permit Tenant to connect to such cables on such terms and conditions as Landlord

3



may prescribe. In no event does Landlord make any representations or warranty with respect to telephone service in the Building, and Landlord shall have no liability with respect thereto.

C.    Additional Services. Landlord shall not be obligated to furnish any services other than those stated above. If Landlord elects to furnish services requested by Tenant in addition to those stated above (including services at times other than those stated above), Tenant shall pay Landlord's then prevailing charges for such services. If Tenant shall fail to make any such payment, Landlord may, without notice to Tenant and in addition to all other remedies available to Landlord, discontinue any additional services. No discontinuance of any such services shall result in any liability of Landlord to Tenant or be considered as an eviction or disturbance of Tenant's use of the Premises. If Tenant's concentration of personnel or equipment are extreme and adversely affect the temperature or humidity in the Premises or Building, Landlord may install supplementary air conditioning units in the Premises; and Tenant shall pay for the cost of installation and maintenance thereof.

D.    Failure or Delay in Furnishing Services. Tenant agrees that Landlord shall not be liable for damages for failure or delay in furnishing any service stated above if such failure or delay is caused, in whole or in part, by any one or more of the events stated in Paragraph 23(j), nor shall any such failure or delay be considered to be an eviction or disturbance of Tenant's use of the Premises, or relieve Tenant from its obligation to pay any Rent when due, or from any other obligations of Tenant under this Lease. If any essential services (such as Heating, air-conditioning, electricity or water) supplied by Landlord are interrupted, and the interruption results from an event other than: (i) fire or casualty as stated in Paragraph 12, (ii) Force Majeure or (iii) Tenant's actions, and the interruption unreasonably and materially interferes with Tenant's use of or access to the Premises for at least three (3) consecutive business days, the Tenant's Base Rent shall be abated on a per diem basis for such period, until such time as the services are restored; and in the event such interruption exceeds thirty (30) consecutive days, Tenant at such time shall have the right to terminate this agreement effective as of such notice date.

6.    RULES AND REGULATIONS. Tenant shall observe and comply and shall cause its subtenants, assignees, invitees, employees, contractors and agents to observe and comply, with the rules and regulations listed on Exhibit "C" , if any, attached hereto and with such reasonable modifications and additions thereto as Landlord may make from time to time. Landlord shall not be liable for failure of any person to obey such rules and regulations. Landlord shall not be obligated to enforce such rules and regulations against any person, and the failure of Landlord to enforce any such rules and regulations shall not constitute a waiver thereof or relieve Tenant from compliance therewith.



7.    CERTAIN RIGHTS RESERVED TO LANDLORD.  Landlord reserves the following rights, each of which Landlord may exercise without notice to Tenant and without liability to Tenant, and the exercise of any such rights shall not be deemed to constitute an eviction or disturbance of Tenant's use or possession of the Premises and shall not give rise to any claim for set-off or abatement of Rent or any other claim; (a) to change the street address of the Building or the suite number of the Premises, if required by applicable governmental authority; (b) to install, affix and maintain any and all signs on the exterior or interior of the Building subject to Tenant's exclusive signage rights as defined in Paragraph 28 of this Lease; (c) to make repairs, decorations, alterations, additions or improvements whether structural or otherwise, in and about the Building, and for such purposes to enter upon the Premises, temporarily suspend services or use of common areas, and Tenant agrees to pay Landlord for overtime and similar expenses incurred if such work is done other than during ordinary business hours at Tenant's request; (d) intentionally omitted; (e) to grant to any person or to reserve unto itself the exclusive right to conduct any business or render any service in the Building, except for such services provided directly to Tenant in connection with Tenant's business operations; (f) to show or inspect the Premises at reasonable times upon advance notice to Tenant of at least two (2) business days, (g) if vacated or abandoned, to prepare the Premises for reoccupancy; (h) to install, use and maintain in and through the Premises, pipes, conduits, wires and ducts servicing the Building, provided that such installation, use and maintenance does not unreasonably interfere with Tenant's use of the Premises; and (i) to take any other reasonable action in connection with the operation, maintenance or preservation of the Building, so long as such action does not materially interfere with Tenant's business operations in the Premises.

8.    MAINTENANCE AND REPAIRS.  Tenant, at its expense, shall maintain and keep the Premises in good order and repair at all times during the Term.  In addition, Tenant shall reimburse Landlord for the cost of any repairs to the Building necessitated by the acts or omissions of Tenant, its subtenants, assignees, invitees, employees, contractors or agents, to the extent Landlord is not reimbursed for such costs under its insurance policies.  Subject to the preceding sentence, Landlord shall perform any maintenance or make any repairs to the Building as Landlord shall desire or deem necessary for the safety, operation or preservation of the Building, or as Landlord may be required or requested to do by an governmental authority or by the order or decree of any court or by any other proper authority. For the avoidance of doubt, nothing in this Paragraph 8 shall construe Tenant to be responsible for any costs of maintenance or repairs from ordinary wear and tear.

9.    ALTERATIONS.

      A.    Requirements.  Tenant shall not make any replacement, alteration, improvement or addition to or removal from the Premises (collectively an "alteration") without the prior written consent of Landlord, which shall not be unreasonably withheld or delayed.  In the event Tenant proposes to make any major alteration, Tenant shall, prior to commencing such alteration, submit to

5



Landlord        for prior written approval; (i) detailed plans and specifications; (ii) sworn statements, including the names, addresses and copies of contracts for all contractors; (iii) all necessary permits evidencing compliance with all applicable governmental rules, regulations and requirements; (iv) certificates of insurance in form and reasonable amounts required by Landlord, naming Landlord and any other parties designated by Landlord as additional insured's; and (v) all other documents and information as Landlord may reasonably request in connection with such alteration. Tenant agrees to pay Landlord's reasonable and actual out-of-pocket costs for review of all such items of the alteration. Neither approval of the plans and specifications nor supervision of the alternation by Landlord shall constitute a representation or warranty by Landlord as to the accuracy, adequacy, or sufficiency of such plans and specifications or the quality of workmanship or the compliance of such alteration with applicable law. Tenant shall pay the entire cost of the alteration and, if requested by Landlord, shall deposit with Landlord prior to the commencement of the alteration, security for the payment and completion of the alteration in form and reasonable amount required by Landlord. Each alteration shall be performed in a good and workmanlike manner, in accordance with the plans and specifications approved by Landlord for the Building. In addition, each alteration shall be performed in compliance with all applicable governmental and insurance company law, regulations and requirements. No alteration shall be required to be performed by union contractors. Each alteration shall be in harmony with Landlord's employees, contractors and other tenants. Each alteration, whether temporary or permanent in character, made by Landlord or Tenant in or upon the Premises (excepting only Tenant's furniture, equipment and trade fixtures) shall become Landlord's property and shall remain upon the Premises at the expiration or termination of this Lease without compensation to Tenant; provided, however, that Landlord shall have the right to require Tenant to remove such alteration at Tenant's sole cost and expense in accordance with the provisions of Paragraph 15 of this Lease, if such requirement to remove was a condition of Landlord's original approval.

B.      Liens.   Upon completion of any major alteration, Tenant shall promptly furnish Landlord with sworn owner's and contractor's statements and full and final waivers of lien covering all labor and materials included in such alteration. Tenant shall not permit any mechanic's or materialmen's lien to be filed against the Building, or any part thereof, arising out of any alteration performed or alleged to have been performed, by or on behalf of Tenant. If any such lien is filed, Tenant shall, within 10 business days thereafter, have such lien released of record or deliver to Landlord a bond in form, amount, and issued by a surety satisfactory to Landlord, indemnifying Landlord against all costs and liabilities resulting from such lien and the foreclosure or attempted foreclosure thereof. If Tenant fails to have such lien so released or to deliver such bond to Landlord, Landlord, without investigating the validity of such lien, may pay or discharge the same; and Tenant shall reimburse Landlord upon demand for the amount so paid by Landlord, including Landlord's expense and attorneys' fees.

6

C.    Landlord Lien Waivers.  Landlord hereby expressly waives and relinquishes any lien right it may have in Tenant's trade fixtures, personal property, equipment, furniture and improvements to the Premises now or hereafter placed in the Premises and shall upon request, promptly execute such waivers, in the form required by Tenant's lender or lenders, waiving any interest Landlord might otherwise have in such items.

10.    INSURANCE.  Tenant, at its expense; shall maintain at all times during the Term the following insurance policies; (a) fire insurance, including extended coverage, vandalism, malicious mischief, sprinkler leakage and water damage coverage and demolition and debris removal, insuring the full replacement cost of all improvements, alterations or additions to the Premises made at Tenant's expense, and all other property owned by or used by Tenant and located in the Premises; (b) commercial general liability insurance, contractual liability insurance and property damage insurance with respect to the Building and the Premises, with limits reasonably set by Landlord from time to time but in any event not less than $1,000,000 combined singled limit for personal injury, sickness or death or for damage to or destruction of property for any one occurrence; and (c) insurance against such other risks and in such other amounts as Landlord may from time to time require.  All such policies shall be issued by insurers with a sound financial condition as evidence by an A.M. Best rating of A or better, licensed to do business in the state in which the Premises are located and shall contain a waiver of any rights of subrogation there under.  In addition, the policies shall name Landlord and any other parties designated by Landlord as additional insured's and shall be primary and not contributory.  Tenant shall, at least 10 days prior to the Commencement Date and within 10 days prior to the expiration of such policy, deliver to Landlord certificates evidence the foregoing insurance or renewal thereof, as the case may be.

11.    WAIVER AND INDEMNITY.

A.    Waiver.  Except to the extent any loss, damage or injury is due to or caused by the negligence or misconduct of Landlord, its property manager or their respective agent or employees, Tenant releases Landlord, its property manager and their respective agents and employees from; and waives all claims for, damage or injury to person or property and loss of business sustained by Tenant and resulting from the Building or the Premises or any part thereof for any equipment therein becoming in disrepair, or resulting from any accident in or about the Building.  This paragraph shall apply particularly, but not exclusively, to flooding damage caused by Building equipment and apparatus, water, snow, frost, steam, excessive heat or cold, broken glass, sewage, gas odors, excessive noise or vibration or the bursting or leaking of pipes, plumbing fixtures or sprinkler devices.

B.    Indemnity.    Except to the extent any loss, damage or injury is due to or caused by the negligence or misconduct of Landlord, its property manager or their

7

respective agents or employees, Tenant agrees to indemnify, defend and hold harmless Landlord, its property manager and their respective agents and employees, from and against any and all claims, demands, actions, liabilities, damages, costs and expenses (including without limitation, attorneys' fees), for injuries to any person and damage to or theft or misappropriation or loss of property occurring in or about the Building and arising from Tenant's use and occupancy of the Premises or from any activity, work, or thing done, permitted or suffered by Tenant in or about the Premises (including, without limitation, any alteration by Tenant) or from any breach or default on the part of Tenant in the performance of any covenant or agreement on the part of Tenant to be performed under this Lease or due to any other act or omission of Tenant, its subtenants, assignees, invitees, employees, contractors and agents. Without limiting the foregoing, Tenant shall indemnify, defend and hold Landlord harmless from any claims, liabilities, damages, costs and expenses arising out of the use, storage, discharge or disposal of hazardous or toxic materials in the Building by Tenant, its subtenants, assignees, invitees, employees, contractors and agents. If any such proceeding is filed against Landlord or any such indemnified party, Tenant agrees to defend Landlord or such party in such proceeding at Tenant's sole cost by legal counsel reasonably satisfactory to Landlord, if requested by Landlord. This provision shall survive the termination of this Lease.

C.     Landlord's Waiver/Indemnification.  Landlord waives all claims it may have against Tenant and against Tenant's agents and employees for any damages sustained by Landlord or by any occupant of the Building, or by any other person, resulting from any cause arising at any time, except for damages resulting from the negligence or willful misconduct of Tenant, its contractors, agents, employees, licensees, and invitees. Landlord agrees to hold Tenant harmless and indemnify it against claims and liabilities for injuries to all persons and for damages to or loss of property occurring in or about the Building, due to any act of negligence or default under this Lease by Landlord, its contractors, agents, employees, licensees and invitees.

12.     FIRE AND CASUALTY. If all or a substantial part of the Premises or the Building is rendered untenantable by reason of fire or other casualty, Landlord may, at its option, either restore the Premises and the Building, or terminate this Lease effective as of the date of such fire or other casualty. Landlord agrees to give Tenant written notice within 30 days after the occurrence of any such fire or other casualty designating whether Landlord elects to terminate this Lease. If Landlord elects to terminate this Lease, Rent shall be paid through and apportioned as of the date of such fire or other casualty. If Landlord elects to restore, Landlord's obligation to restore the Premises shall be limited to restoring those improvements in the Premises existing as of the date of such fire or other casualty which were made at Landlord's expense and shall exclude any furniture, equipment, fixtures, additions, alternations or improvements in or to the Premises which were made at Tenant's expense. If Landlord elects to restore, Rent shall abate for that part of the Premises which is untenantable on a per diem basis from the date of such fire or other casualty until Landlord has substantially completed its repairs and restoration

8



work, provided that Tenant does not occupy such part of the Premises during said period. The foregoing notwithstanding, Tenant may, at its option, terminate this Lease effect as of the date of such fire or other casualty if (i) such fire or other casualty occurs at any time during the last 12 months of this Lease, or (ii) if Landlord elects to restore and Landlord's estimated time to restore is in excess of six (6) months after such fire or casualty, provided Landlord's estimate is commercially reasonable.

13.   CONDEMNATION.  If the Premises or the Building is rendered untenantable by reason of a condemnation (or by a deed given in lieu thereof), then either party may terminate this Lease by giving written notice of termination to the other party within 30 days after such condemnation, in which event this Lease shall terminate effective as of the date of such condemnation.  If this Lease so terminates, Rent shall be paid through and apportioned as of the date of such condemnation.  If such condemnation does not render the Premises or the Building untenantable, this Lease shall continue in effect and Landlord shall promptly restore the portion not condemned to the extent reasonably possible to the condition existing prior to the condemnation.  In such event, however, Landlord shall not be required to expend an amount in excess of the proceeds received by Landlord from the condemning authority.  Landlord reserves all rights to compensation for any condemnation.  Tenant hereby assigns to Landlord any right Tenant may have to such compensation, and Tenant shall make no claim against Landlord for compensation for termination of Tenant's leasehold interest under this Lease or interference with Tenant's business.  Nothing contained in this paragraph shall preclude Tenant from seeking compensation and making claim against the condemning authority to the extent attributable to Tenant's leasehold interest in the Premises.

14.   ASSIGNMENT AND SUBLETTING.

A.   <u>Landlord's Consent.</u>  Tenant shall not, without prior written consent of Landlord; (i) assign, convey, mortgage or otherwise transfer this Lease or any interest hereunder, or sublease the Premises, or any part thereof, whether voluntarily or by operation of law; or (ii) permit the use of the Premises by any person other than Tenant and its employees and invitees.  Any such assignment, sublease or use described in the preceding sentence (a "Transfer") occurring without the prior written consent of Landlord shall be void and of no effect.  Landlord's consent to any Transfer shall not constitute a waiver of Landlord's right to withhold its consent to any future Transfer.  Landlord's consent to any Transfer or acceptance of rent from any party other than Tenant shall not release Tenant from any covenant or obligation under this Lease.  Landlord may require as a condition to its consent to any assignment of this Lease that the assignee execute an instrument in which such assignee assumes the obligations of Tenant hereunder, provided, however, Tenant may, without consent of Landlord, assign or convey the Lease to a direct affiliate of Tenant.

B.   <u>Standards for Consent.</u>  If Tenant desires the consent of Landlord to a Transfer, Tenant shall submit to Landlord, at least 30 days prior to the proposed effective date of the Transfer, a written notice which includes such information as



Landlord may require about the proposed Transfer and the transferee. If Landlord does not terminate this Lease, in whole or in part, pursuant to Paragraph 14C, Landlord shall not unreasonably withhold or delay its consent to any assignment or sublease. Landlord shall not be deemed to have unreasonably withheld its consent if, in the judgment of Landlord; (i) the transferee is of a character or engaged in a business which is not in keeping with the standards or criteria used by Landlord in leasing the Building; (ii) the financial condition of the transferee is such that it may not be able to perform its obligations in connection with this Lease; (iii) the purpose for which the transferee intends to use the Premises or portion thereof is in violation of the terms of this Lease or the lease of any other tenant in the Building; (iv) the transferee is a tenant of the Building; or (v) any other basis which Landlord reasonably deems appropriate. If Landlord wrongfully withholds its consent to any Transfer, Tenant's sole and exclusive remedy therefore shall be to seek specific performance of Landlord's obligation to consent to such Transfer.

C.    Recapture.    Landlord shall have the right to terminate this Lease as to that portion of the Premises covered by a Transfer. Landlord may exercise such right to terminate by giving notice to Tenant at any time with 30 days after the date on which Tenant has furnished to Landlord all of the items required under Paragraph 14B. If Landlord exercises such right to terminate, Landlord shall be entitled to recover possession of, and Tenant shall surrender such portion of, the Premises (with appropriate demising partitions erected at the expense of Tenant) on the effective date of the proposed Transfer. In the event Landlord exercises such right to terminate, Landlord shall have the right to enter into a lease with the proposed transferee without incurring any liability to Tenant on account thereof. If Landlord consents to any Transfer, Tenant shall pay to Landlord 50% of all Rent and other consider received by Tenant in excess of the Rent paid by Tenant hereunder for the portion of the Premises so transferred. Such rent shall be paid as and when received by Tenant. In addition, Tenant shall pay to Landlord any reasonable attorneys' fees and actual out-of-pocket expenses incurred by Landlord in connection with any proposed Transfer, whether or not Landlord consents to such Transfer.

15.    SURRENDER. Upon termination of the Term or Tenant's right to possession of the Premises, Tenant shall return the Premises to Landlord in good order and condition, ordinary wear and damage by fire or other casualty excepted. If Landlord requires Tenant to remove any alterations pursuant to Paragraph 9, then such removal shall be done in a good workmanlike manner; and upon such removal Tenant shall restore all Premises to its condition prior to the installation of such alterations. If Tenant does not remove such alterations after request to do so by Landlord, Landlord may remove the same and restore the Premises; and Tenant shall pay the cost of such removal and restoration to Landlord upon demand. Tenant shall also remove its furniture, equipment, trade fixtures and all other items of personal property from the Premises prior to the termination of the Term or Tenant' right to possession of the Premises. If Tenant does not remove such items, Tenant shall be conclusively presumed to have conveyed the

10



same to Landlord without further payment or credit by Landlord to Tenant; or at Landlord's sole option such items shall be deemed abandoned, in which event Landlord may cause such items to be removed and disposed of at Tenant's expense, without notice to Tenant and without obligation to compensate Tenant.

16. DEFAULT AND REMEDIES.

    A.   Default. The occurrence of any of the following shall constitute a default (a "default") by Tenant under this Lease: (i) Tenant fails to pay any Rent when due and such failure is not cured within five (5) business days after written notice from Landlord; (ii) Tenant fails to perform any other provision of this Lease and such failure is not cured with 30 days (or immediately if the failure involves a hazardous condition) after written notice from Landlord; (iii) the leasehold interest of Tenant is levied upon or attached under process of law; (iv) Tenant dies or dissolves; (v) Tenant abandons or vacates the Premises; or (vi) any voluntary or involuntary proceedings are filed by or against Tenant under any bankruptcy, insolvency or similar laws and, in the case of any involuntary proceedings, are not dismissed within 60 days after filing.

    B.   Right of Re-entry. Upon the occurrence of a Default, Landlord may elect to terminate this Lease, or, without terminating this Lease, terminate Tenant's right to possession of the Premises. Upon any such termination, Tenant shall immediately surrender and vacate the Premises and deliver possession thereof to Landlord. Tenant grants to Landlord the right to enter and repossess the Premises and to expel Tenant and any others who may be occupying the Premises and to remove any and all property there from, without being deemed in any manner guilty of trespass and without relinquishing Landlord's right to Rent or any other right given to Landlord hereunder or by operation of law.

    C.   Reletting. If Landlord terminates Tenant's right to possession of the Premises without terminating this Lease, Landlord may relet the Premises or any part thereof. In such case, Landlord shall use reasonable efforts to relet the Premises on such terms as Landlord's other available space and shall not be required to accept any tenant offered by Tenant or to observe any instructions given by Tenant about such reletting. Tenant shall reimburse Landlord for the costs and expenses of reletting the Premises, including, but not limited to, all brokerage, advertising, legal, alteration and other expenses incurred to secure any such reletting. If, after payment of the expenses of reletting the Premises which have not been reimbursed by Tenant, rent collected from a subsequent tenant is insufficient to pay monthly the full amount of the Rent, Tenant shall pay to Landlord the amount of each monthly deficiency as it becomes due. If such consideration is greater than the amount necessary to pay the full amount of the Rent, the full amount of such excess shall be retained by Landlord and shall in no event be payable to Tenant.

D.    Termination of Lease. If Landlord terminates this Lease, Landlord may recover from Tenant and Tenant shall pay to Landlord, on demand, as and for liquidated and final damages, and accelerate lump sum amount equal to the amount by which Landlord's commercially reasonable estimate of the aggregate amount of Rent owing from the date of such termination through the Expiration Date plus Landlord's commercially reasonable estimate of the aggregate expenses of reletting the Premises, exceeds Landlord's commercially reasonable estimate of the fair rental value of the same period (after deducting from such fair rental value the time needed to relet the Premises and the amount of concessions which would normally be given to a new tenant), both discounted to present value at the rate of 3% per annum.

E.    Other Remedies. Landlord may, but shall not be obligated to perform any obligation of Tenant under this Lease; and, if Landlord so elects, all costs and expenses paid by Landlord in performing such obligation, together with interest at the Default Rate, shall be reimbursed by Tenant to Landlord on demand. Any and all remedies set forth in the Lease: (i) shall be in addition to any and all other remedies Landlord may have at law or in equity; (ii) shall be cumulative; and (iii) may be pursued serially or concurrently as Landlord may elect. The exercise of any remedy by Landlord shall not be deemed an election of remedies or preclude Landlord from exercising any other remedies in the future.

F.    Bankruptcy. If Tenant becomes bankrupt, the bankruptcy trustee shall not have the right to assume or assign this Lease unless the trustee complies with all requirements of the United States Bankruptcy Code; and Landlord expressly reserves all of its rights, claims and remedies there under.

G.    Waiver of Trial by Jury. Landlord and Tenant waive trial by jury in the event of any action, proceeding or counterclaim brought by either Landlord or Tenant against the other in connection with Lease.

17.    HOLDING OVER. If Tenant retains possession of the Premises after the expiration or termination of the Term or Tenant's right to possession of the Premises, Tenant shall pay Rent during such holding over at 150% of the rate in effect immediately preceding such holding over computed on a monthly basis for each month or partial month that Tenant remains in possession. Tenant shall also pay, indemnify and defend Landlord from and against all claims and damages, consequential as well as direct, sustained by reason of Tenant's holding over. The provisions of this Paragraph do not waive Landlord's right of re-entry or right to regain possession by actions at law or in equity or any other rights hereunder, and any receipt of payment by Landlord shall not be deemed a consent by Landlord to Tenant's remaining in possession or be construed as creating or renewing any lease of right of tenancy between Landlord and Tenant.

18.    SECURITY DEPOSIT. At the time of the execution of this Lease, Tenant shall deposit with Landlord a $6,000 security deposit. Such security deposit shall be returned

12



to the Tenant promptly after the Expiration Date and inspection by Landlord as to condition of property.

19.     SUBSTITUTION OF OTHER PREMISES. Intentionally omitted.

20.     ESTOPPEL CERTIFICATES. Tenant agrees that, from time to time within 10 days of request by Landlord, Tenant shall execute and deliver to Landlord a written certificate certifying: (i) that this Lease is unmodified and in full force and effect (or if there have been modifications, a description of such modifications and that this Lease as modified is in full force and effect); (ii) the dates to which Rent has been paid; (iii) that Tenant is in possession of the Premises, if that is the case; (iv) that Landlord is not in default under this Lease, or if Tenant believes Landlord is in default, the nature thereof in detail; (v) that Tenant has no off-sets or defenses to the performance of its obligations under this Lease (or if Tenant believes there are any off-sets or defenses, a detailed explanation thereof); and (vi) such additional matters as may be requested by Landlord, it being agreed that such certificate may be relied upon by a prospective purchaser, mortgagee or other person having or acquiring an interest in the Building. If Tenant fails to execute and deliver any such certificate within 10 days after written request by Landlord, such failure shall constitute a default hereunder.

21.     SUBORDINATION. This Lease is and shall be expressly subject and subordinate at all times to (a) any present or future ground, underlying or operating lease of the Building, and all amendments, renewals and modifications to any such lease, and (b) the lien of any present or future mortgage or deed of trust encumbering fee title to Building and/or the leasehold estate foreclosed, or if any such lease be terminated, upon request of the mortgagee, beneficiary or lessor, as the case may be, Tenant will attorn to the purchaser at the foreclosure sale or to the lessor under such lease, as the case may be. The foregoing provisions are declared to be self-operative and no further instruments shall be required to effect such subordination and/or attornment; provided, however, that Tenant agrees upon request by any such mortgagee, beneficiary, lessor or purchase at foreclosure, as the case may be,. To execute such subordination and/or attornment instruments as may be required by such person to confirm such subordination and/or attornment on the form customarily used by such party. Notwithstanding the foregoing to the contrary, and such mortgagee, beneficiary or lessor may elect to give the rights and interests of Tenant under this Lease (excluding rights in and to insurance proceeds and condemnation awards) priority over the lien of its mortgage of deed of trust or the estate of its lease, as the case may be. In the event of such election and upon the mortgagee, beneficiary or lessor notifying Tenant of such election, the rights and interests of Tenant shall be deemed superior to and to have priority over the lien of said mortgage or deed of trust or the estate of such lease, as the case may be, whether this Lease is dated prior to or subsequent to the date of such mortgage, deed of trust or lease. In such event, Tenant shall execute and deliver whatever instruments may be required by such mortgagee, beneficiary or lessor to confirm such superiority on the form customarily used by such party. If Tenant fails to execute any instrument required to be executed by Tenant under this Paragraph 21 within 10 days after written request, such failure shall constitute a default hereunder.

13



22.    QUIET ENJOYMENT.  As long as no default exists, Tenant shall peacefully and quietly have and enjoy the Premises for the Term, free from interference by Landlord, subject, however, to the provisions of this Lease.  The loss or reduction of Tenant's light, air, or view will not be deemed a disturbance of Tenant's occupancy of the Premises nor will it affect Tenant's obligations under this Lease or create any liability of Landlord to Tenant.

23.    NOTICES.  All notices and demands to be given by one party to the other party under this Lease shall be given in writing, mailed or delivered to Landlord or Tenant, as the case may be, at the address set forth above or at such other address as either party may hereafter designate.  Notices shall be delivered by hand or by United States certified or registered mail, postage prepaid, return receipt requested, or by a nationally recognized overnight air courier service.  Notices shall be considered to have been given upon the earlier to occur of actual receipt or two (2) days after posting in the United States mail.

24.    MISCELLANEOUS.

A.    <u>Successors and Assigns.</u>  Subject to Paragraph 14 of this Lease, each provision of this Lease shall extend to, bind and inure to the benefit of Landlord and Tenant and their respective heirs, legal representatives, successors and assigns; and all reference herein to Landlord and Tenant shall be deemed to include all such parties.

B.    <u>Entire Agreement.</u>  This Lease, and the riders and exhibits, if any, attached hereto which are hereby made a part of this Lease, represent the complete agreement between Landlord and Tenant; and Landlord has made no representations or warranties except as expressly set forth in this Lease.  No Modification or amendment of or waiver under this Lease shall be binding upon Landlord or Tenant unless in writing signed by Landlord and Tenant.

C.    <u>Time of Essence.</u>  Time is of the essence of this Lease and each and all provisions.

D.    <u>Severability.</u>  The invalidity or unenforceability of any provision of this Lease shall not affect or impair any other provisions.

E.    <u>Governing Law.</u>  This Lease shall be governed by and construed in accordance with the laws of the state of Colorado.

F.    <u>Attorneys' Fees.</u>  If legal action is instituted hereunder, the prevailing party in such action shall be entitled to recover reasonable attorneys' fees and costs from the other party.

G.    <u>Force Majeure.</u>  Landlord shall not be in default hereunder and Tenant shall not be excused from performing any of its obligations hereunder if Landlord

14



is prevented from performing any of its obligations hereunder due to any accident, breakage, strike, shortage of materials, acts of God or other causes beyond Landlords reasonable control.

H.    Captions.  The headings and titles in this Lease are for convenience only and shall have no effect upon the construction or interpretation of this Lease.

I.    No Waiver.  No receipt of money by Landlord from Tenant after termination of this Lease or after the service of any notice or after the commencing of any suit or after final judgment for possession of the Premises shall renew, reinstate, continue or extend the Term or affect any such notice or suit.  No waiver of any default of Tenant shall be implied from any omission by Landlord to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default specified in the express waiver and then only for the time and to the extent there stated.

J.    No Recording.  Unless required to contract obligations, Tenant shall not record this Lease or a memorandum of this Lease in any official records.

K.    Limitation or Liability.  Any liability of Landlord under this Lease shall be limited solely to its interest in the Building, and in no event shall any personal liability be asserted against Landlord in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord.  In no event shall any personal liability be asserted against Tenant in connection with this Lease.

L.    Accord and Satisfaction.  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly installments of Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction.  Landlord may accept such check for payment without prejudice to Landlord's right to recover the balance of such Rent or to pursue any other remedies provided in this Lease.

25.    RIGHT TO RENEW.  Provided Tenant is not in default under any terms or provisions of the Lease after any applicable cure periods, Tenant shall have the right to renew the term of this Lease for two (2) additional three (3) year terms upon giving written notice to Landlord of Tenant's intent to renew.  Such notice shall be given no later than three (3) months prior to the expiration date of the initial Lease term and any renewal terms as applicable.  Landlord shall no later than four (4) months prior to the commencement of the applicable renewal term, designate the market rental rate for the option period.  Tenant shall have the right, by written notice given to landlord within thirty (30) days after Tenant's receipt of Landlord's designation ("Tenant's Notice") to accept or reject new rental rate. Is is anticipated Landlord and Tenant shall work together in good faith to determine a new Base Rent for the renewal period.  Landlord retains right to begin marketing property upon receipt of Tenant's Notice if such notice rejects new

15



base rent so as to provide landlord enough time to seek a new Tenant for the space._The Base Rent during any renewal term shall be no more than 130% of the rate charged during the last year of the existing lease.

26.     RIGHT OF FIRST REFUSAL.  Intentionally omitted.

27.     PARKING.  Parking is provided on site, on a non-reserved basis.  Tenant's employees shall not park in the front rows of the building as those are reserved for customers of Landlord and Tenant.

28.     SIGNAGE.  Tenant shall have the right to mount an exterior sign on the existing monument sign at the southeast portion of the property, if such signage is allowed and is not in addition to the maximum allowable signage available under law for the Landlord's use of the remainder of the Building as a branch bank or its lease or assignment of the landlord's space in the Building to another financial institution.  Tenant shall also have the right to build a new monument sign that meets all applicable government agencies approval.  The size, location and materials of all monument signage shall be subject to Landlord's reasonable approval and shall meet all of the City of Colorado Springs' requirements and approvals.  All costs of installation, maintenance, and removal of any signs shall be borne by Tenant.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.


LANDLORD, Peoples National Bank, Colorado

By: _____
        Brendan Zahl

Title:   President/CEO


TENANT, Photo Stencil, LLC

By: _____
        Kimberly Nanney

Title:   Chief Financial Officer


16

EXHIBITS:

A   DESCRIPTION OF THE PREMISES

B.  LEGAL DESCRIPTION/ADDRESS

C.  RULES AND REGULATIONS



EXHIBIT "A"

DESCRIPTION OF THE PREMISES AND FLOOR LAYOUT





EXHIBIT "B"

LEGAL DESCRIPTION/ADDRESS

Lot 4, Academy Village Filing No. 2, County of El Paso, State of Colorado

The property is located in El Paso County at 13725 Struthers Road, Colorado Springs, Colorado

19



EXHIBIT "C"

RULES AND REGULATONS

## FIRST AMENDMENT TO COMMERCIAL LEASE

THIS FIRST AMENDMENT TO COMMERCIAL LEASE (this "**Amendment**") is made effective as of the 1st day of April, 2016 between Peoples National Bank, a national banking association, having an address at 5175 North Academy Boulevard, Colorado Springs, CO 80918 ("**Landlord**") and Photo Stencil, LLC, a Delaware limited liability company, having an address of 13725 Struthers Road, Suite 202, Colorado Springs, CO 80921 ("**Tenant**").

## RECITALS

A.      Landlord and Tenant entered into a Commercial Lease dated August 25, 2015 (the "**Lease**").  All capitalized terms used but not defined herein shall have the meaning ascribed to them in the Lease.

B.      Tenant is currently in default under the Lease for failure to timely pay rent when due for the months of January, February and March 2016 together with associated late charges and interest at the Default Rate (the "**Outstanding Balance**").  The term "Outstanding Balance" also includes unpaid future amounts due and owing to Landlord, including without limitation, Deferred Rent, defined below.

C.      Tenant has requested from Landlord a modification of the rental terms under the Lease, all as further set forth herein, in order to (i) temporarily defer the Rent amounts payable for the months of February through July of 2016, and (ii) pay the deferred difference between the original Base Rent under the Lease and the modified Rent over the remaining Rent payments due in 2017 and 2018.

D.      Landlord has agreed to temporarily forbear on enforcing its remedies with respect to the Outstanding Balance and to defer certain amounts of the Rent pursuant to this Amendment so long as there is no further default by Tenant under the Lease.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, including without limitation the mutual covenants herein contained, Landlord's forbearance on enforcing its remedies with respect to the Outstanding Balance and the deferral of Rent payments, as well as the foregoing recitals which are incorporated herein by reference, the materiality and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      **Ratification**.  Except as modified herein, the Lease remains unmodified, ratified and affirmed and remains enforceable in accordance with its terms.

2.      **2016 Base Rent Payments**. Commencing effective as of February 1, 2016, and subject to the terms and conditions hereof: Rent for calendar year 2016 under the lease (other than Deferred Rent, defined below) shall be payable as follows:

a.      As partial payment of Rent for February, March, and April, Tenant shall pay $2,500.00 per month, as follows:

          i.      Landlord acknowledges receipt of $2,500.00 as partial payment of Rent for February, received by Landlord on March 25, 2016;

          ii.      Partial payment of Rent for March shall be $2,500.00, due and payable on April 4, 2016;

          iii.      Partial payment of Rent for April shall be $2,500.00, due and payable on April 22.

          b.      Partial payment of Rent for May shall be $3,000.00, due and payable to Landlord on or before May 5, 2016.

          c.      Partial payment of Rent for June shall be $3,500.00, due and payable to Landlord on or before June 5, 2016.

          d.      Partial payment of Rent for July shall be $4,000.00 due and payable to Landlord on or before July 5, 2016.

          e.      Full Rent for August through December shall be $6,516.88 per month, payable on or before the fifth day of each month.

          f.      The difference between (i) the original Base Rent payable per month in 2016 for the period from February through July (the amount of $6,516.88 per month, cumulatively, $39,101.28) and (ii) the partial amounts actually paid under Section 2 (cumulatively, $18,000.00) is $21,101.28, which amount is referred to herein as the "**Deferred Rent.**"

3.      **Deferred Rent Payments**.  In addition to the base Annual Rent payable during calendar years 2017 and 2018, Tenant shall pay, together with each monthly payment of Rent when due beginning January 5, 2017, an installment of Deferred Rent in the amount of $1,004.82.

4.      **End of Term**. On September 30, 2018, provided that no further event of default has occurred by Tenant in Landlord's sole determination and discretion, including without limitation the timely payment of all Rent and Deferred Rent pursuant to Sections 2 and 3 above, Landlord agrees to forgive all late charges and interest accrued on Deferred Rent.

5.      **Outstanding Balance**.

          a.      Acknowledgment of Default. The parties agree and acknowledge that as of the date hereof, Tenant is in default under the Lease and owes Landlord the Outstanding Balance.

          b.      Interest on Outstanding Balance.  For the avoidance of doubt, until and unless forgiven in writing, and pursuant to Section 4, interest shall continue to accrue on the Outstanding Balance at the Default Rate.

          c.      Further Default. Upon the occurrence of any further default under the Lease or under the terms of this Amendment, including without limitation a failure to make the

2

payments required under Sections 2 and 3 above timely when due, Landlord shall immediately and without notice be entitled to proceed with any right and remedy to which it is entitled under the original Lease, including, without limitation, collection of all the Outstanding Balance together with associated late charges and accrued interest at the Default Rate.

6. **No Waiver by Landlord**. Nothing contained in this Amendment and no actions taken or admitted by Landlord in relation thereto, including, without limitation, the forbearance by Landlord in respect of exercising its rights and remedies under the Lease, shall constitute a waiver of any rights or remedies Landlord may have under such instruments or applicable law, except to the extent specifically set forth in this Amendment, all of which rights and remedies Landlord specifically reserves.

7. **Construction**. In the event of any inconsistency between the provisions of this Amendment and the Lease, the provisions of this Amendment shall control.

8. **Further Assurances**. Tenant shall execute and deliver such additional documents and Amendments reasonably required from time to time to effectuate this Amendment.

9. **Strict Performance**. Landlord's failure to insist upon strict performance of any terms hereof shall not be deemed to be a waiver of any terms under this Amendment or the Lease. Landlord may exercise any right or remedy it may have under this Amendment without prejudice to any additional rights or remedies Landlord may have under the Lease, or any other Amendment between Landlord and Tenant.

10. **Miscellaneous**.

a. This Amendment shall be construed in accordance with the laws of the State of Colorado.

b. This Amendment shall be binding upon the successors, representatives, and assigns of Tenant and Landlord. Tenant may not assign its rights or obligations under the Lease or this Amendment in whole or in part without the prior written consent of Landlord.

c. In the event any provision of this Amendment is held to be invalid or unenforceable, said holding shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

d. This Amendment embodies the final, entire Amendment of the parties and supersedes all other prior commitments, agreements, representations and understandings, whether written or oral, relating to the subject matter of this Amendment. This Amendment may not be modified, amended or changed unless such modification, amendment or change is evidenced in writing by Landlord.

e. Time is of the essence with regard to all payment obligations of Tenant under this Amendment.

*[Signature Page Follows]*

3

IN WITNESS WHEREOF, this First Amendment to Commercial Lease, which may be executed in counterparts and delivered electronically, is effective as of the date first above written.

PEOPLES NATIONAL BANK,
a national banking association


By: _____
    Name: _____
    Title: _____


PHOTO STENCIL, LLC,
a Colorado limited liability company

By: _____
    Name: _E. A. Weissman_____
    Title: _CEC_____

[Signature Page to First Amendment to Commercial Lease]

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

IN RE:                                                )
                                                      )
PHOTO STENCIL, LLC                                    )        Case No. 16-16897-MER
EIN: 26-0334354                                       )        Chapter 11
                                                      )
    Debtor.                                           )

## STIPULATION ON ASSUMPTION AND MODIFICATION OF COMMERICAL LEASE

The Debtor, Photo Stencil, LLC and Peoples National Bank, a national banking association, enter into this Stipulation On Assumption And Modification Of Commercial Lease based upon the following:

1.   The Debtor filed for relief under Chapter 11 of the Bankruptcy Code on July 12, 2016 and the Debtor remains a debtor-in-possession.

2.   Peoples National Bank ("PNB") is a national banking association having an address at 5175 North Academy Boulevard, Colorado Springs, Colorado 80918.

3.   PNB, as landlord, entered into a Commercial Lease dated August 25, 2015 with the Debtor as tenant ("Lease"). The Lease has been amended one time through a First Amendment To Commercial Lease dated on or about April1, 2016.

4.   The Lease was for certain office space located at 13725 Struthers Road, Suite 202, Colorado Springs, Colorado 80921. The office space consisted of approximately 4,135 square feet of space and the monthly rent during the second year of the Lease starting in September 2016 is approximately $6,616.88 per month.

5.   The Lease does not terminate until September 30, 2018.

6.   The Debtor has indicated to PNB that it cannot afford the Lease at the current rate and that it will cooperate with PNB in terms of rejecting or modifying the Lease.

7.   The parties are both interested in resolving their differences and providing the Debtor with a termination of the Lease and PNB with a way to recover maximum rent from one or more new tenants.

NOW THEREFORE, the parties agree as follows:

1.   The Lease is hereby modified as set forth in this Stipulation.

**EXHIBIT B**

2. The Lease shall be modified as of August 31, 2016 and from such date forward the Lease shall provide a month to month tenancy as opposed to its current term, subject to the following:

a. The Debtor's rent for the Lease shall be $2,500 per month commencing in the month of August 2016 with payment due no later than August 8, 2016 and with similar rent due for future months until the Lease is terminated. No additional rent shall be due to PNB from the Debtor on a monthly basis or at Lease termination;

b. Either party to the Lease, the Debtor or PNB, may terminate the month to month tenancy by providing the other party with a thirty (30) day advance written notification of Lease termination; and

c. The Debtor shall vacate two contiguous offices as of August 31, 2016 and turn such spaces over to PNB. PNB may select the two offices that are to be turned over and PNB has the right to release the two offices in its sole discretion to whoever it selects, on whatever terms it deems appropriate, and for whatever rent it can obtain.

3. This Stipulation shall be subject to approval by the Bankruptcy Court on notice to creditors with opportunity for a hearing.

4. The Debtor shall assume the Lease, as amended by this Stipulation, pursuant to 11 U.S.C. §365(a).

DATED: August 29, 2016

PHOTO STENCIL, LLC

By: _____
Name: Eric A. Weissman
Title: CEO

PEOPLES NATIONAL BANK

By: _____
Name: Terry Hillman
Title: VP

2